UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

**FILED**
OCT 0 5 2015

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

|  |  |  |
|---|---|---|
| JOHN GRAHAM, | * | CIV 13-4100 |
| Petitioner, | * |  |
| vs. | * | MEMORANDUM OPINION |
|  | • | AND ORDER DENYING |
| DOUG WEBER, | * | MOTION FOR |
|  | * | PRELIMINARY INJUNCTION |
| Respondent. | * |  |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

Petitioner, John Graham (Graham), moves the Court to enter a preliminary injunction prohibiting both counsel and parties to Graham's currently pending 28 U.S.C. § 2254 action from publicly commenting on Graham's criminal conviction rendered in South Dakota's Seventh Judicial Circuit, Pennington County for the murder of Anna Mae Aquash. For the following reasons, the requested relief is denied.

## BACKGROUND

In February 1976, the body of Anna Mae Aquash was discovered in a remote region of the Badlands between Kadoka and Wanblee, South Dakota. Thereafter, it was determined that Aquash had died as the result of a bullet wound to the head. In 2003, John Graham, a Canadian National, was charged with Aquash's murder in United States District Court, District of South Dakota. Graham was extradited in 2007. The charge was eventually dismissed in federal court for lack of jurisdiction, but Graham was then indicted in South Dakota state court on separate counts of premeditated murder and felony murder based on kidnapping. A charge of felony murder based on rape was dismissed by the State prior to trial. Graham was found guilty of felony murder predicated on the charge of kidnapping and sentenced to life in prison without parole. Presently, Graham is incarcerated in the South Dakota State Penitentiary.

Graham challenged his conviction in South Dakota court and was denied relief on May 30, 2012. A petition for habeas corpus was filed in the Seventh Circuit Court of South Dakota on May 24, 2013,

which was denied. A motion for a Certificate of Probable Cause was also filed with the South Dakota Supreme Court on July 18, 2013, which was also denied. On September 17, 2013, Graham filed the pending 28 U.S.C. § 2254 habeas corpus petition in federal court for the District of South Dakota.

On March 20, 2014, during the pendency of Graham's habeas corpus action, Attorney General Marty Jackley spoke at Black Hills State University in Spearfish, South Dakota. The event was titled "South Dakota Cold Case Study – the Murder of Annie Mae Aquash." It is this event, and a subsequent similar event, that is the basis for Graham's requested relief. The event was promoted in the region with various printed announcements. One such announcement read, "Prosecutors say Graham and two other [American Indian Movement (AIM)] activists, Arlo Looking Cloud and Theda Clarke, killed Aquash in December 1975 because they suspected she was a government informant." On March 24, 2014, counsel for Graham wrote to Jackley requesting that Jackley refrain from publicly speaking about Graham's involvement in the Aquash case and ultimate conviction. The letter, in sum, requested that Jackley consent to a self-imposed gag order on the parties. Jackley responded, rejecting the requested gagging and stating that the speaking engagements were not improper.

In March 2015, Jackley again spoke about the Aquash case to a group of some 40 attendees at a benefit for the Casey Tibbs Rodeo Center Museum in Ft. Pierre, South Dakota. This event was reported on in the Capital Journal published in Pierre, South Dakota. The Capital Journal reported that, while in Ft. Pierre, Jackley spoke about Graham raping Aquash prior to him and other AIM members driving her to the area in the Badlands where she was killed. The Capital Journal further reported that Jackley commented on the suspected murder of another AIM activist, Ray Robinson, and that Graham may have information related to Robinson's death. Stephen Lee, *Jackley: Aquash Case Might Help Solve Other Cold Cases from Wounded Knee*, CAPITAL JOURNAL (March 2, 2015), *available at* http://www.capjournal.com/news/jackley-aquash-case-might-help-solve-other-cold-cases-from/article_4d07ab1c-c164-11e4-8994-2f1bd10207aa.html. Graham has moved the Court for a preliminary injunction imposing a gag order on the parties, prohibiting them from speaking about the Graham-Aquash case during the pendency of Graham's 28 U.S.C. § 2254 action.

## DISCUSSION

### I. Preliminary Injunction

"Defined broadly, a preliminary injunction is an injunction that is issued to protect plaintiff from irreparable injury and to preserve the court's power to render a meaningful decision after a trial on the merits." 11A CHARLES ALAN WRIGHT, ET AL., FEDERAL PRACTICE & PROCEDURE § 2947 (3d ed. 2014). In determining whether to grant a preliminary injunction a court considers (1) the probability of the movant's success on the merits; (2) the threat of irreparable harm to the movant; (3) the balance between this harm and the injury that granting the injunction will inflict on other interested parties; and (4) whether the issuance of the preliminary injunction is in the public interest. *See Dataphase Sys., Inc. v. C L Sys., Inc. (Dataphase)*, 640 F.2d 109, 114 (8th Cir. 1981) (en banc). The movant bears the burden of proof concerning the four factors. *Gelco Corp. v. Coniston Partners*, 811 F.2d 414, 418 (8th Cir. 1987). The court balances the four factors to determine whether a preliminary injunction is warranted. *Dataphase*, 640 F.3d at 113; *West Pub. Co. v. Mead Data Cent., Inc.*, 799 F.2d 1219, 1222 (8th Cir. 1986). "A district court has broad discretion when ruling on preliminary injunction requests[.]" *Coca-Cola Co. v. Purdy*, 382 F.3d 774, 782 (8th Cir. 2004) (citing *United Indus. Corp. v. Clorox Co.*, 140 F.3d 1175, 1179 (8th Cir. 1998)). "In balancing the equities no single factor is determinative. . . . In every case, it must be examined in the context of the relative injuries to the parties and the public" *Dataphase*, 640 F.3d at 113.

Graham has failed to meet the threshold requirement that the requested injunctive relief bear a relationship to the underlying complaint. A preliminary injunction must be denied if it is of a differing character than that which may be finally granted after trial on the merits or when the preliminary injunction contemplates matters unrelated to the underlying action. *Devose v. Herrington*, 42 F.3d 470, (8th Cir. 1994) (citing *Penn v. San Juan Hosp., Inc.*, 528 F.2d 1181, 1185 (10th Cir. 1975)) ("[A] party moving for a preliminary injunction must necessarily establish a relationship between the injury claimed in the party's motion and the conduct asserted in the complaint."). *See* Wright, *supra; Kaimowitz v. Orlando, Fla*, 122 F.3d 41 (11th Cir. 1997), opinion amended on reh'g, 131 F.3d 950 (11th Cir. 1997) (preliminary injunction denied as wholly unrelated to the underlying action); *Redd v. Lutgen*, No. C11-3046-MWB,

2013 WL 5757864, at *2 (N.D. Iowa Oct. 23, 2013) (denying a preliminary injunction meant to reverse an inmate's transfer from one facility to another as unrelated to the underlying alleged First Amendment violation).

*Redd v. Lutgen* involved a request for a preliminary injunction from an Iowa inmate. The inmate-movant, Redd, initially filed a complaint pursuant to 42 U.S.C. § 1983 against five individuals for an alleged violation of his Free Exercise rights. As a result, Redd contended that he was repeatedly subjected to facility transfers by prison officials. The transfers, Redd asserted, caused him injury due to the burden placed on him and his family. Thereafter, Redd sought a preliminary injunction in order to return himself from Fort Dodge to the Newton Correctional Facility. The court denied Redd's preliminary injunction. The *Redd* court reasoned that

> [t]he [relationship] requirement is necessary because the purpose of a preliminary injunction is to impose a provisional remedy that will remain in place until the issues can be decided on their merits at trial. This is precisely why one of the *Dataphase* factors explores the probability that the movant will ultimately succeed on the merits. A preliminary injunction that bears no relationship to the events alleged in the complaint would be unworkable, as the issues giving rise to that injunction will not be addressed, let alone resolved, at trial.

*Redd*, 2013 WL 5757864, at *3.

Graham's claims for relief in his 28 U.S.C. § 2254 action are based on (1) extradition; (2) allegedly erroneous jury instructions related to kidnapping; (3) an allegedly erroneous conviction under South Dakota's felony murder statute; and (4) ineffective assistance of counsel. Application for Writ of Habeas Corpus at 3, John Graham v. Doug Weber, 13-cv-04100 (Sept. 12, 2013 D.S.D.). Graham asserts, however, that were a claim for defamation brought against Jackely, Graham would likely prevail. That claim is made with regard to probability of success on the merits, the first *Dataphase* factor. To the contrary, the Court finds that the probability of Graham succeeding on a libel claim against Jackley is very low, even without considering any immunity issues. At this point, the South Dakota Supreme Court has twice affirmed Graham's conviction. Truth is a defense to a libel action. The other libel claims not a part of the conviction are not central to the libel claim. This is a 28 U.S.C. § 2254 action, not a libel suit. Were the proposed

4

preliminary injunction granted, the issues that the injunction operated to stay would not be resolved by a resolution of the 28 U.S.C. § 2254 action. Specifically, by the end of this action, whether or not Jackley defamed Graham will not have been decided. Like the *Redd* court, the claims contained here in the habeas claims and the injunction claims are wholly distinct from each other. Accordingly, Graham has failed to prove that he is entitled to the preliminary injunction. While the Court does not comment on the merits of Graham's claim regarding his conviction, the preliminary injunction is denied.

## II. Gag Order

The Court's analysis, however, must go further. While Graham is not entitled to the requested injunctive relief for a claimed libel, it is still necessary the Court decide if a gag order should issue in order to preserve Graham's fair trial rights as it is Graham's constitutional trial rights that he is seeking to protect, not vindication for a claimed libel.

Graham contends that Rule 3.6 of the South Dakota Rules of Professional Conduct may and should be used to impose the gag order on parties to his 28 U.S.C. § 2254 action. Rule 3.6(a) reads,

> A lawyer who is participating or has participated in the investigation or litigation of a matter shall not make an extrajudicial statement that the lawyer knows or reasonably should know will be disseminated by means of public communication and if the lawyer knows or reasonably should know that it will have a substantial likelihood of materially prejudicing an adjudicative proceeding in the matter.

South Dakota Rules of Professional Responsibility, R. 3.6(a). "A gag order is a prior restraint on speech and, as such, is 'the most serious and least tolerable infringement on First Amendment Rights.'" *United States v. McGregor*, 838 F. Supp. 2d 1256, 1260 (M.D. Ala. 2012) (quoting *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 559, 96 S. Ct. 2791 (1976)). "The exercise of First Amendment rights, however, can sometimes imperil the administration of fair criminal trials." *Id.* (quoting *United States v. Carmichael*, F. Supp. 2d 1267, 1291 (M.D. Ala. 2004)). Therefore, First Amendment rights "'may be subordinated to other interests that arise' during a criminal trial." *Id.* (quoting *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 32 n. 18 (1984)). Neither South Dakota courts nor the Eighth Circuit has squarely ruled on whether Rule 3.6, which closely tracks its American Bar Association (ABA) analogue, may be used to impose such

a restriction on attorneys. This Court must therefore look to the Supreme Court and lower courts for guidance.

## A. The Supreme Court

The starting point for such an inquiry is *Gentile v. State Bar of Nevada*, 501 U.S. 1030, 111 S. Ct. 2720 (1991), which involved Nevada's application of its version of Rule 3.6 to the discipline of an attorney. The issue was whether lawyers, when subject to discipline, may insist on the same stringent First Amendment standard afforded to the public and media or whether a State may punish speech by a lawyer by meeting a lesser constitutional standard. The Court resolved the case in favor of a lesser standard. In *Gentile*, the petitioner, Gentile, was a member of the Nevada bar. He held a press conference shortly after his client was indicted on criminal charges but six months before trial. The decision to hold the conference was a result of monitoring the publicity surrounding the case pre- and post-indictment. "He did not blunder into a press conference, but acted with considerable deliberation." *Id.* at 1042. Gentile delivered a statement setting forth his opinion of the case and he responded to questions from the media. The statement illustrated Gentile's position that the State was using his client as a "scapegoat" to insulate the guilty parties: the police department and its "crooked cops." *Id.* at 1034. The public was exposed only to the fraction of Gentile's remarks that were disseminated in two newspaper stories and two television broadcasts. Moreover, the information provided at the press conference had already been put into the public forum in one form or another.

Gentile's client was eventually acquitted. Subsequently, the State of Nevada filed a complaint against Gentile, alleging that he had violated Nevada Supreme Court Rule 177, which governed attorney involvement in trial publicity. Similar to the South Dakota rule in issue here, the Nevada rule read, in pertinent part, that an attorney is prohibited from making "an extrajudicial statement that a reasonable person would expect to be disseminated by means of public communication if the lawyer knows or reasonably should know that it will have a substantial likelihood of materially prejudicing an adjudicative proceeding." *Id.* at 1033 (quoting Nevada Supreme Court Rule, R. 177). Gentile was found by the disciplinary board to have violated the rule and was disciplined accordingly. The Nevada Supreme Court

affirmed. The United States Supreme Court, however, found that Nevada's application of the Rule in *Gentile* violated the First Amendment and reversed the Nevada Supreme Court.

The Supreme Court noted that the speech in question was "directed at public officials and their conduct in office." *Id.* at 1034. "The judicial system, and in particular our criminal justice courts, play a vital part in a democratic state, and the public has a legitimate interest in their operations." *Id.* at 1035. With these principles in mind, the Supreme Court held that the Nevada Rule and its ABA equivalent were not categorically unconstitutional. Moreover, the Court ruled that the "substantial likelihood of material prejudice" language, which is also found in the South Dakota rule, "is not necessarily flawed" and meets constitutional muster. *Id.* at 1036, 63. "[T]he 'substantial likelihood of material prejudice' standard constitutes a constitutionally permissible balance between the First Amendment rights of attorneys in pending cases and the State's interest in fair trials." *Id.* at 1075. What courts must ensure, however, is that the rule is applied "in a proper and narrow manner, . . ." as a "necessary limitation[] on lawyers' speech." *Id.* at 1036, 75. The limits on a lawyer's speech should be directed at "two principal evils: (1) comments that are likely to influence the actual outcome of the trial, and (2) comments that are likely to prejudice the jury venire, even if an untainted panel can ultimately be found." *Id* at 1075.

### B. Lower Courts

While the Supreme Court's interpretation of Rule 3.6 was in the context of *ex post facto* lawyer discipline, district courts have applied the *Gentile* rationale in the context of gag orders. In *United States v. McGregor*, 838 F. Supp. 2d 1256 (M.D. Ala. 2012), the government unsealed indictment information against eleven defendants who were alleged to have participated in a bribery conspiracy in order to pass a Senate bill that would have legalized electronic bingo in Alabama. The case received amplified press coverage due to both the high profile of the defendants and interaction with the media from both prosecution and defense. The case became so ensnared in media coverage that, during the first trial, the court designated an area outside the courthouse for members of the media and instructed jurors to enter and exit the courthouse through the other side of the building. At the conclusion of the first trial, the jury found two defendants not guilty on all counts, but was unable to reach a verdict on all the counts for the

7

remaining defendants. During retrial voir dire, much of the questioning centered on the potential jurors' exposure to and knowledge about the first trial. Prior to the retrial, however, the government had moved for a gag order to be imposed on participating attorneys. The order would have imposed limitations on neither the defendants themselves nor the media.

Deciding whether to issue the gag order, the *McGregor* court discussed the dichotomy of imposing a restraint on the media versus an attorney. Lower courts have read *Nebraska Press Ass'n v. Stuart* "as establishing that there must be a clear and present danger of prejudice before a court may issue a prior restraint against the media." *McGregor*, 838 F. Supp. 2d at 1261 (internal quotations omitted). In the context of circumscribing attorney speech, however, *Gentile* pronounced "that the appropriate standard for the punishment of attorney speech was whether it presented a 'substantial likelihood of material prejudice.'" *Id.* (quoting *Gentile*, 501 U.S. at 1075). "Thus, regulating attorney speech requires 'a less demanding standard than that established for regulation of the press . . .'" *Id.* (quoting *Gentile*, 501 U.S at 1074). "Any regulation imposed upon a lawyer[, however,] must be narrowly tailored." *Id.* (quoting *Gentile*, 501 U.S. at 1075-76).

What the *McGregor* court dealt with was which standard to apply in the context of a gag order on attorneys of record in an action. The court ultimately favored the *Gentile* standard for four reasons: (1) the gag order in issue was directed at all the attorneys of record; (2) the Circuits that had opted to adhere to the more rigorous *Stuart* standard had done so prior to the *Gentile* decision; (3) as was found in *Gentile*, attorneys are agents of the court, justifying a lesser standard; and (4) the *Gentile* standard was expressly adopted from the ABA and a majority of states' professional rules. Grounded in the foregoing reasons, the *McGregor* court fashioned a test that must be met in order to impose a gag order on attorneys: "(1) the attorney's speech presents a substantial likelihood of material prejudice to the proceedings; (2) the proposed protective order is narrowly tailored; (3) alternatives to the protective order would not be effective; and (4) the order would be effective in achieving the government's goal." *Id.* at 1262.

While weighing the various interests, the *McGregor* court explained what the Alabama Bar meant to accomplish by adopting its version of Rule 3.6:

> Preserving the right to a fair trial necessarily entails some curtailment of the information that may be disseminated about a party prior to trial, particularly where trial by jury is involved. If there were no such limits, the result would be the practical nullification of the protective effect of the rules of forensic decorum and the exclusionary rules of evidence.

*Id.* (quoting Ala. R. Prof. Conduct 3.6 Comments). The court then went on to apply the four prong test to the facts presented. Much of that analysis was dedicated to a discussion of what defense counsel's statements entailed. *See id.* at 1265 ("[D]efense counsel opined on the credibility of witnesses and speculated as to the government's trial strategy and jury deliberations. . . . The frequency, intensity, and ubiquity of defense counsel's remarks made it far more probable that the jury would become aware of the extrajudicial comments."). The district court ultimately found that the attorney's speech did present a substantial likelihood of material prejudice, meeting the first prong of the above test. The court found unpersuasive the notion that the attorney's extrajudicial comments were merely an exercise of his right-to-respond to in-court testimony. "A right-to-respond to in-court testimony would eviscerate Rule 3.6 by allowing every defense attorney to 'respond' to any witness testimony with a news conference." *Id.* at 1265.

Next, the second prong of being narrowly tailored was met as the proposed gag order applied only to the attorneys of record and did not prohibit those attorneys from speaking about the "bare facts" of the case to the media.

Third, the court found that the government had failed to meet the third prong. Specifically, the gag order was not the least restrictive alternative. "The familiar list of alternative options include: continuing or transferring the case; sequestration of the jury; extensive voir dire; and emphatic jury instructions." *Id.* at 1266 (citing *Gentile*, 501 U.S. at 1075). "Neither party,[however,] requested a continuance or change-of-venue due to trial publicity." *Id.* While discussing voir dire as an effective alternative, the court noted that, due to the publicity surrounding the first trial and the overall prominence of the case for two years, "voir

9

dire was especially searching" at the retrial. *Id.* Lastly, the *McGregor* court "found that attorney adherence to Rule 3.6 was a less restrictive alternative to the government's proposed gag order." *Id.*

Fourth, the government's proposed action would not have been effective. Even without the participation of defense counsel, "the media still camped outside the courthouse, reported daily on the proceedings, and continued the live blog of the witness testimony." *Id.*

Because the government's proposed gag order failed the last two prongs, the court declined to grant the government's motion. Alternatively, in an effort to balance the attorneys' First Amendment rights and the defendants' fair trial rights, the court instructed the attorneys to adhere to the commands of Alabama Rule of Professional Conduct 3.6. The court felt confident that the attorneys were capable of interpreting the Rule and applying it accordingly. "Because of their legal training, attorneys are knowledgeable regarding which extrajudicial communications are likely to be prejudicial." *Id.* at 1267.

The United States District Court for the Eastern District of Pennsylvania was also faced with the question of whether to impose a restriction on party attorney's speech, but in the context of a civil action. In *Constand v. Cosby*, 229 F.R.D. 472 (E.D. Pa. 2005), Constand alleged that Cosby, a well-known celebrity, deceived her into ingesting a narcotic, which rendered her only semi-conscious. During her inebriated state, Constand alleged that Cosby sexually assaulted her. Subsequently, Constand reported the events to police, which she alleged resulted in Cosby and his representatives making false statements to the media. Both Constand and Cosby sought orders from the court. Constand sought an order to keep confidential prospective plaintiff witnesses' identities. Cosby sought to prohibit the parties from disclosing information learned in discovery outside of what was necessary for litigation. Cosby's proposed order, in effect, was a request for the court to issue a gag order on the parties, "prohibiting . . . any extrajudicial comments about any aspect of the case." *Cosby*, 229 F.R.D. at 474.

The *Cosby* court employed the *Gentile* rationale when it considered the proposed nondisclosure order. In doing so, it stated that "the Court must be convinced, not merely suspect, that there is a substantial

10

likelihood that extrajudicial statements by counsel, in light of the circumstances of the case, will materially prejudice the pending proceedings." *Id.* at 475 (citing *Gentile*, 501 U.S. at 1075). The court then rejected the proposed order for three reasons: (1) the breadth of the gag order to include parties and witnesses raised constitutional issues that a restriction on only the lawyers would not; (2) the majority of the media coverage revolved around the averments of the parties, which made silencing the lawyers outside of the courtroom ineffective; and (3) lawyers' extrajudicial comments are policed by the Pennsylvania Rules of Professional Conduct. It is the Rules, the court noted, specifically Rule 3.6, from which the Supreme Court derived the "substantial likelihood" standard in *Gentile*. Rather than impose the proposed gag order, the court, "given the need for close judicial superintendency," found "good reason to adopt Rule 3.6 as a rule of procedure applicable to counsel and enforced by the Court in [the] case." *Id.* at 477. The court held that breaches of Rule 3.6 would be punished pursuant to Rule 16(f) of the Federal Rules of Civil Procedure or pursuant to the inherent power of the court to enter prophylactic orders protecting the right to a fair trial. As such, monetary sanctions, referral to the Disciplinary Board, revocation of *pro hac vice* status, or other just punishment were possible sanctions for violations of Rule 3.6.

Ultimately, the *Cosby* court found that "[a]ttorney public speech is not always undesirable nor is media attention always deleterious to the interest of justice. The lamp of public scrutiny shining brightly over the proceedings can assist the Court in reaching a just result under the watchful eye of an informed public." *Id.* at 478. Abuse of the same public scrutiny by counsel, however, can be abated by judicial enforcement of Rule 3.6, which is an effective alternative to a broad gag order.

### C. Analysis

It is the "substantial likelihood of material prejudice" standard announced in *Gentile* that this Court endorses and controls the case at bar. The standard has been endorsed by the Supreme Court and various lower courts[1], *see Gentile v. State Bar of Nevada*, 501 U.S. 1030 (1991); *United States v. McGregor*,

---

[1] While the Supreme Court endorsed the "substantial likelihood of material prejudice standard," the Circuit Courts of Appeals have not uniformly done the same. The Sixth, Seventh, and Ninth Circuits apply the *Stuart* "clear and present danger" standard. *See United States v. Ford*, 830 F. 2d 596, 598

11

838 F. Supp. 2d 1256 (M.D. Ala. 2012); *Constand v. Cosby*, 229 F.R.D. 472 (E.D. Pa. 2005); *Niv v. Hilton Hotels Corp.*, No. 06 Civ. 7839 (PKL), 2007 WL 2077003, at *2 (S.D.N.Y. July 18, 2007) (holding that a court will enter an injunction limiting extrajudicial statements if the injunction is an effective, least restrictive remedy); *Munoz v. City of New York*, No. 11 Civ. 7402 (JMF), 2013 WL 1953180, at *1 (S.D.N.Y. May 10, 2013) (defendant failed to present evidence showing "'a substantial likelihood of materially prejudicing'" an impartial trial . . .) (quoting N.Y. Comp. Codes R. & Regs. tit. 22, § 1200.0). *But see Ruggieri v. Johns-Manville Products Corp.*, 503 F. Supp. 1036, 1039 (D.R.I. 1980) (applying a "serious and imminent threat" test to the context of extrajudicial statements by attorneys), and the language is contained in Rule 3.6 of South Dakota's Rules of Professional Responsibility. Thus, the Court agrees with Graham regarding the proper standard to apply. Graham further asserts, however, that the extrajudicial statements attributable to Jackley pose a substantial likelihood of materially prejudicing the 28 U.S.C. § 2254 action. The Court does not agree.

Similar to the proposed order in *Cosby*, Graham is asking this Court to "enter a preliminary injunction prohibiting the parties and their counsel from publicly commenting on this case." Petitioner John Graham's Brief in Support of His Motion for an Order to Restrict Pre-Trial Publicity at 4, Graham v.

---

(6th Cir. 1987); *Levine v. United States District Court*, 764 F.2d 590, 595 (9th Cir. 1985); *Chicago Council of Lawyers v. Bauer*, 522 F.2d 242, 249 (7th Cir. 1975). The Third and Fifth Circuits have adopted the *Gentile* "substantial likelihood" standard. *See United States v. Scarfo*, 263 F.3d 80, 94 (3rd Cir. 2001); *United States v. Brown*, 218 F.3d 415, 427 (5th Cir. 2000). The Fourth and Tenth Circuits employ a "reasonable likelihood" standard. *See In re Russell*, 726 F.2d 1007, 1010 (4th Cir. 1984); *United States v. Tijerina*, 412 F.2d 661, 666 (10th Cir. 1969). The Circuits that did not adopt the *Gentile* standard, however, did so prior to *Gentile*. Thus, it is reasonable to conclude that if confronted with the scenario now, post-*Gentile*, those Circuits may adopt the "substantial likelihood" standard. The remaining Circuit Courts have yet to rule on which standard to apply. The South Dakota Supreme Court indicated its endorsement of the *Gentile* "substantial likelihood of material prejudice" standard by using that language in its Rules of Professional Responsibility. South Dakota Rules of Professional Responsibility, R. 3.6(a). In *U.S. v. Silver*, No. 15-CR-93 (VEC), 2015 WL 1608412, at *7 (E.D.N.Y April 10, 2015), the District Court refused to dismiss the indictment despite the targeted and inflammatory statements by the chief prosecutor prior to indictment. In doing so, the court noted "that this is not a disciplinary proceeding and therefore the question of whether the U.S. Attorney's extrajudicial remarks violated any ethical rules is not, per se, before the Court." *Silver*, 2015 WL 1608412, at *7.

12

Young, No. 13-cv-04100-RAL (D.S.D. March 18, 2015). Graham urges that the speaking engagements of Attorney General Marty Jackley pose a "substantial likelihood of materially prejudicing an adjudicative proceeding" in violation of Rule 3.6 of the South Dakota Rules of Professional Responsibility. While the foregoing discussion of case law indicates that the Rule may be used as a basis for the imposition of a gag order, the various courts cited have all declined to do so. So too here, the proposed course of action is too broad in scope.

Rule 3.6 is applicable to "[a] lawyer who is participating or has participated in the investigation or litigation of a matter . . ." South Dakota Rules of Professional Responsibility R. 3.6(a). Clearly, the Rule has application to South Dakota's Attorney General in this context. The ABA Rule, which the South Dakota Rule emulates, was said by the Supreme Court to shield against comments likely to influence the outcome of a trial by prejudicing a jury. *Gentile*, 501 U.S. at 1075 (limiting lawyer speech should be directed at "two principal evils: (1) comments that are likely to influence the actual outcome of the trial, and (2) comments that are likely to prejudice the jury venire, even if an untainted panel can ultimately be found."). Graham's requested application here, however, is not sufficiently directed at these goals.

First, the relevant proceeding in question, as it is the only active adjudicatory proceeding, is not a trial that is likely to be affected by extrajudicial statements. *See Hirschkop v. Snead*, 594 F.2d 356, 372 (4th Cir. 1979) ("Judges necessarily must consider evidence that has no direct bearing on the guilt or innocence of the accused. . . . [If] this evidence is excluded, the judge must nevertheless adjudge the accused to be guilty or innocent without considering the evidence which they have heard and held to be inadmissible."). As this is a 28 U.S.C. § 2254 action, it is the presiding judge who decides the outcome. Part I., *supra*. The above cited cases came in the context of jury trials and each requested gag order was denied. The likelihood that extrajudicial statements of this nature may assail Graham's fair trial rights in the present proceedings is so attenuated as to be beyond remote. Comment six of the South Dakota Rules is illustrative on this point:

> Another relevant factor in determining prejudice is the nature of the proceeding involved. Criminal jury trials will be most sensitive to extrajudicial speech. Civil trials may be less sensitive. Non-jury hearings and arbitration proceedings may be even less affected. The

13

> Rule will still place limitations on prejudicial comments in these cases, but the likelihood of prejudice may be different depending on the type of proceeding.

South Dakota Rules of Professional Responsibility R. 3.6 cmt. 6. Thus, this Court disagrees that the publicity created a substantial likelihood of materially prejudicing the pending, non-jury adjudicatory proceeding. Second, as was previously discussed, there is no jury component to the present action that is in need of Rule 3.6's protection. Graham urges as his principal claim that it is the possibility of empaneling a jury for a possible, future jury trial that both implicates the Rule and otherwise warrants a gag order. None of the previously discussed case law was in such a context, however. Again, the cases applying their own version of Rule 3.6 were all in the context of an imminent, if not always then active, trial. Here, however, the trial concluded roughly five years ago. Imposing a gag order on all parties at this time contingent on the possibility of a future trial resulting from this proceeding is too causally attenuated. The *Gentile* Court found unconstitutional the sanctioning of a lawyer who had extrajudicially commented on the merits of a case sixth months prior to the trial. Accordingly, the extrajudicial statements in issue do not pose a substantial likelihood of materially prejudicing the pending 28 U.S.C § 2254 action or any retrial that could possibly result from this pending action.

Graham also argues that the gag order is the most effective, narrowly tailored means of curtailing the alleged prejudice. The sheer magnitude of public interest surrounding this case, however, belies Graham's claims. Even in the absence of Jackley's speeches, the public consciousness would hardly be bereft of other media centered on the events surrounding the slaying of Anna Mae Aquash and Graham's involvement. *See e.g.*, Eric Konigsberg, *Who Killed Anna Mae?*, THE NEW YORK TIMES MAGAZINE (April 25, 2014), *available at* http://www.nytimes.com/2014/04/27/magazine/who-killed-anna-mae.html; Karen Fragala-Smith, *More on the Life and Times of Anna Mae Aquash*, THE NEW YORK TIMES MAGAZINE (April 30, 2014), *available at* http://6thfloor.blogs.nytimes.com/2014/04/30/more-on-the-life-and-times-of-anna-mae-aquash/; Michael Donnelly, *Getting Away With Murder: Killing Anna Mae Aquash, Smearing John Trudell*, COUNTERPUNCH (January 17, 2006), *available at* http://www.counterpunch.org/2006/01/17/killing-anna-mae-aquash-smearing-john-trudell/; JOHANNA BRAND & WARREN ALLMAND, THE LIFE AND DEATH OF ANNA MAE AQUASH (James Lorimer &

Company 2d ed. 1993) (1978). Thus, enforcing a restriction on parties and counsel could scarcely be said to be an effective means of curtailing speech unfavorable to Graham.

Moreover, imposing the gag order prayed for here would prohibit the speech in question for an indefinite amount of time. The public, however, has a legitimate interest in the functioning of its criminal justice system.

> "Without publicity, all other checks are insufficient; in comparison of publicity, all other checks are of small account. Recordation, appeal, whatever other institutions might present themselves in the character of checks, would be found to operate rather as cloaks than checks; as cloaks in reality, as checks only in appearance."

*Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 569, 100 S.Ct. 2814 (1980) (quoting 1 J. BENTHAM, RATIONALE OF JUDICIAL EVIDENCE 524 (1827)). The *Richmond* Court also observed that "[w]hen a shocking crime occurs, a community reaction of outrage and public protest often follows. Thereafter, the open processes of justice serve an important prophylactic purpose, providing an outlet for community concern, hostility, and emotion." *Richmond Newspapers*, 448 U.S. at 571 (internal citations omitted). Jackley's statements in issue occurred after his prosecution of Graham was completed. From what is contained in the record, the statements operated to educate the public on a topic it has been interested in even prior to Graham's extradition from Canada. The gag order, were it granted, would stifle speech the public evidently desires to consider for an indefinite amount of time and is contingent on a trial that may or may not even happen. What is more, the gag order prayed for would apply to counsel and the parties represented. As mentioned in the discussed case law, gagging non-attorneys raises additional constitutional concerns and would implicate a higher level of constitutional scrutiny. The gag order, thus, is not narrowly tailored to the facts of this case although this Court recognizes it could tailor a different gag order. As the *McGregor* court noted, courts have at their disposal means through which an impartial jury may be empaneled despite extensive publicity: change of venue, continuation, jury sequestration, searching voir dire, emphatic jury instructions, and admonishing counsel to adhere to the rules of professional responsibility.

The Court denies the requested gag order as the extrajudicial statements in issue do not pose a substantial likelihood of materially prejudicing the pending adjudicatory proceeding. In addition, the statements at issue do not warrant a gag order to prevent possible prejudice in the event a retrial takes place sometime in the future. Any prejudice from statements would have to be evaluated for their impact at the time of any future trial proceedings. Any present action based on the possibility of a future trial at some date well into the future is too speculative. Counsel remains at all times subject to the appropriate Rules of Professional Responsibility. Accordingly,

IT IS ORDERED that Graham's Motion for Order to Restrict Publicity, Doc. 42, is denied.

Dated this 5th day of October, 2015.

BY THE COURT:

*Lawrence Piersol* (signature)

Lawrence L. Piersol
United States District Judge

ATTEST:
JOSEPH HAAS, CLERK
By *Ab Peterson* (signature)
 Deputy