

FILED

OCT 2 6 2016

CLERK

UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

|  |  |  |
|---|---|---|
| JOHN GRAHAM, | \* | CIV 13-4100 |
| | \* | |
| Petitioner, | \* | |
| | \* | |
| -vs- | \* | MEMORANDUM OPINION AND |
| | \* | ORDER DENYING APPLICATION |
| DARIN YOUNG, Warden, | \* | FOR WRIT OF HABEAS CORPUS |
| | \* | |
| Respondent. | \* | |
| | \* | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Petitioner, John Graham, is an inmate at the South Dakota State Penitentiary. He filed a pro se application for writ of habeas corpus pursuant to 28 U.S.C. § 2254 on September 17, 2013.[1] Respondent Darin Young has moved for summary judgment, asserting the state court correctly denied Graham's habeas claims. Respondent has submitted for the Court's review the relevant state court records and transcripts of the underlying state court criminal trial. For the following reasons, the writ will be denied.

## BACKGROUND

In February 1976, Anna Mae Aquash's remains were found in a remote area of the Badlands near Wanblee in South Dakota. In 2003, Graham, a Canadian citizen, was charged in federal court with premeditated murder of Aquash. In 2007, Graham was extradited to South Dakota from Canada. The federal murder charge was dismissed by this Court because the indictment failed to allege Graham's Indian status, and the Eighth Circuit affirmed. *See United States v. Graham*, 572 F.3d 954 (8th Cir. 2009). In 2009, Graham was indicted by a Pennington County grand jury on state

---

[1] Paul Wolf, a lawyer not licensed to practice law in South Dakota, assisted Graham in writing his petition. On October 30, 2013, Chase Iron Eyes, a member of the South Dakota Bar, filed a notice of appearance as attorney for Graham. Paul Wolf was admitted to practice in this Court pro hac vice on November 5, 2013.

charges of premeditated murder and felony murder. The underlying felony was alleged to be the kidnapping of Aquash.

Prior to trial, the United States requested permission from Canada to try Graham on the state charges. The Consent to Waiver of Specialty, signed by the Canadian Minister of Justice on February 2, 2010, provides:

> Consent to Waiver of Specialty Article 12(1)(iii) of the *Treaty on Extradition between Canada and the United States of America*
> *United States of America v. John Graham*
> Having regard to the request from the United States of America dated December 18, 2009, (Diplomatic Note No. 852) and to the provisions of sub-paragraph 12(1)(iii) of the *Treaty on Extradition between Canada and the United States of America*, I hereby consent to the detention, prosecution and, if he is convicted, punishment of John Graham with respect to the offences which are set forth in the Indictment, No. 09–3953, filed on September 9, 2009, in the Seventh Circuit Court, County of Pennington, namely:
>
> Count 1: Murder while in the Commission of any felony namely kidnapping, in violation of South Dakota Codified Law 22–16–9 and 22–19–1; and
>
> Count 3: Premeditated Murder, in violation of South Dakota Codified Law 22–16–4.

*State v. Graham*, 2012 SD 42, § 12, 815 N.W.2d 293, 299 n.6 (2012).

On January 26, 2011, a jury convicted Graham of felony murder in violation of SDCL 22-16-9. He was acquitted of premeditated murder. Graham was sentenced to life in prison.

Graham raised the following issues on direct appeal to the South Dakota Supreme Court:

1. Whether the doctrine of specialty deprived the State of jurisdiction to try Graham on the state felony murder charge when he had been extradited to the United States on the federal charge of premeditated murder;

2. Whether the circuit court erred in allowing Looking Cloud's and Maloney's testimony restating Looking Cloud's 2002 telephonic statement to Maloney;

3. Whether the circuit court erred in allowing Yellow Wood's testimony that Aquash said that Peltier made a statement accusing Aquash of being an informant;

4. Whether the circuit court erred in allowing Ecoffey's testimony that Peltier, in the presence of Aquash, made a self-incriminatory statement admitting that he killed an FBI agent;

5. Whether there was sufficient evidence to convict Graham of felony murder;

6. Whether Graham's sentence of life imprisonment without parole was authorized by statute, and whether the sentence was cruel and unusual punishment under the Eighth Amendment.

The South Dakota Supreme Court rejected these claims and affirmed Graham's conviction and sentence on May 30, 2012. *State v. Graham*, 815 N.W.2d 293 (S.D. 2012).

On May 24, 2013, Graham petitioned for state habeas corpus relief. He raised the following grounds for relief:

1. The court lacked jurisdiction because Canada has no law comparable to felony murder;

2. The jury did not find Graham guilty of kidnapping because the jury instructions did not include every element of the offense;

3. Graham's indictment and jury instructions were duplicitous because they merged kidnapping and felony murder into a single count;

4. Graham's felony murder conviction is void because it is based on a statute that was repealed in 2005;

5. Graham did not receive a fair trial based in part on the alleged lack of evidence of his guilt and on counsel's alleged ineffective assistance for "failing to call any of the obvious witnesses or mention any of the well-known alternative theories of the murder[.]"

All of Graham's habeas claims were denied by the state court. A certificate of probable cause was not issued. (Doc. 31-1.)

Graham timely filed a pro se motion for certificate of probable cause with the South Dakota Supreme Court pursuant to 21-27-18.1. (Doc. 31-2). On September 9, 2013, the South Dakota Supreme Court issued an order dismissing the motion for certificate of probable cause "for failure

to serve a copy of the motion upon the opposing party, this service being a prerequisite to the Court's jurisdiction to consider said motion pursuant to SDCL 21-27-18.1." (Doc. 31-6.)

Graham timely filed this federal habeas petition. Respondent argued that the entire federal petition was procedurally defaulted because the South Dakota Supreme Court denied Graham's habeas claims on the independent and adequate ground that Graham failed to serve the motion for certificate of probable cause simultaneously with its filing as required by SDCL 21-27-18.1.[2] The Respondent did not cite one other case where the South Dakota Supreme Court had dismissed a timely filed motion for certificate of probable cause for lack of jurisdiction because the petition had not been served at the time of filing.[3] This Court ruled Graham's habeas claims were not procedurally defaulted because there was no adequate state law ground barring federal habeas review.

The claims presented in Graham's pending writ of habeas corpus filed pursuant to 28 U.S.C. § 2254 are the same as those raised in his state habeas, with one additional claim: that the Court should consider all of the errors in the aggregate and find that Graham's trial lawyer provided ineffective assistance of counsel.

## DISCUSSION

### I. STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), a habeas petitioner cannot obtain relief based on a claim adjudicated on the merits in state court unless the adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable

---

[2] The statute requires service of the motion for certificate of probable cause be "made upon both the attorney general and the appropriate state's attorney." SDCL 21-27-18.1.

[3] In the Sur-Sur-Reply in Support of Motion to Dismiss or For Summary Judgment (doc. 41), filed over two months after this Court denied the motion to dismiss, Respondent attached copies of two orders from the South Dakota Supreme Court dated May 20, 2005 and October 11, 2013, indicating that in those two cases the court dismissed motions for a certificate of probable cause for failing to serve the motions on the attorney general and state's attorney. (Doc. 41-2.) The copies of the two orders of dismissal are not cause for this Court to reverse its ruling on the motion to dismiss in this case.

4

application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d). Under AEDPA, "clearly established Federal law" refers to the holdings, as opposed to the dicta, of the Supreme Court's decisions at the time of the relevant state court decision. *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003). The Supreme Court has emphasized that Supreme Court decisions are the only ones that can form the basis justifying habeas relief; circuit court cases cannot. *Id.*; *see also Lopez v. Smith*, — U.S. —, 135 S.Ct. 1 (2014) (per curiam) ("We have emphasized, time and again, that the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 110 Stat. 1214, prohibits the federal courts of appeals from relying on their own precedent to conclude that a particular constitutional principle is 'clearly established.'").

A state court decision is "contrary to" Supreme Court precedent "if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases," or "if the state court confronts a set of facts that are materially indistinguishable from a decision of th[e] Court and nevertheless arrives at a result different from [the Court's] precedent." *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000). A state court decision involves an unreasonable application of federal law "if the state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case." *Id.* at 407.

"In order for a federal court to find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (citation omitted). "The state court's application must have been 'objectively unreasonable.'" *Id.* at 520-21 (citation omitted); *see also LaFrank v. Rowley*, 340 F.3d 685, 689 (8th Cir. 2003) (under "unreasonable application" clause, federal habeas court may not issue writ simply because it concludes in its independent judgment that relevant state court decision applied clearly established law erroneously or incorrectly; rather, application must be objectively unreasonable). The habeas petitioner bears the burden of demonstrating the objectively unreasonable nature of the state court decision in light of controlling Supreme Court authority. *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002).

The "contrary" and "unreasonable application" standards are "difficult to meet," and "highly deferential" for evaluating state-court rulings, "which demands that state-court decisions be given the benefit of the doubt." *Cullen v. Pinholster*, 563 U.S.170, 181 (2011) (quoting *Woodford*, 537 U.S. at 24). These thresholds are "'difficult to meet,' because the purpose of AEDPA is to ensure that federal habeas relief functions as a 'guard against extreme malfunctions in the state criminal justice systems,' and not as a means of error correction." *Greene v. Fisher*, — U.S. —, 132 S.Ct. 38, 43 (2011) (quoting *Harrington v. Richter*, 562 U.S. 86, 102 (2011)).

Even where constitutional error is found in § 2254 proceedings, habeas petitioners are entitled to relief only if the federal court finds that the error "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993). In reversing the Ninth Circuit's holding that a state court's decision denying relief to defendants was unreasonable, the Supreme Court recently explained:

> There must be more than a "reasonable possibility" that the error was harmful. *Brecht, supra*, at 637, 113 S.Ct. 1710 (internal quotation marks omitted). The *Brecht* standard reflects the view that a "State is not to be put to th[e] arduous task [of retrying a defendant] based on mere speculation that the defendant was prejudiced by trial error; the court must find that the defendant was actually prejudiced by the error." *Calderon v. Coleman*, 525 U.S. 141, 146, 119 S.Ct. 500, 142 L.Ed.2d 521 (1998) (*per curiam* ).

*Davis v. Ayala*, — U.S. —, 135 S. Ct. 2187, 2198 (2015).

## II. CLAIMS

### A. Claim 1: State Court Jurisdiction

Graham contends that the trial court lacked jurisdiction because Canada has no law comparable to felony murder. More specifically, Graham asserts that the state felony murder charge does not satisfy the "dual criminality" requirement of the United States-Canada Extradition Treaty, which generally requires that Graham's alleged criminal activity be a crime in both nations. Respondent counters that Graham lacks standing to challenge his extradition and that his argument is devoid of merit.

On direct appeal to the South Dakota Supreme Court, Graham argued that the doctrine of specialty was violated by his extradition and, thus, the trial court lacked jurisdiction. The South Dakota Supreme Court rejected that claim. Graham specifically raised the dual criminality challenge in his state habeas action. In rejecting that claim, the post-conviction state court said: "The South Dakota Supreme Court found specifically that Canada explicitly consented to the prosecution of Graham on the Pennington County indictment charging felony murder and it therefore had jurisdiction to try to [sic] matter."

### 1. Standing

Respondent first argues that because Canada consented to Graham's prosecution for felony murder, Graham lacks standing to challenge his extradition as a violation of the treaty because the Canadian government consented to Graham's prosecution under the treaty. Graham asks this Court to follow *United States v. Alvarez-Machain*, 504 U.S. 655 (1992), in order to find that he has standing to challenge his extradition as violating the United States-Canada Extradition Treaty.

In *Alvarez–Machain*, the defendant was abducted in Mexico and brought to the United States to face federal criminal charges. The defendant sought dismissal of the indictment, alleging that the extradition treaty between the United States and Mexico was violated by his forcible abduction and, accordingly, the court lacked jurisdiction over him. The Supreme Court disagreed and held that the existence of an extradition treaty does not preclude the United States from acquiring jurisdiction over a fugitive by other means, unless the treaty expressly provides otherwise. Examining the treaty, which was silent about the obligations of each country to not engage in forcible abductions, the Supreme Court concluded that the treaty did "not purport to specify the only way in which one country may gain custody of a national of the other country for the purposes of prosecution." *Id.* at 664. The extradition treaty only serves to "provide[ ] a mechanism which would not otherwise exist, requiring, under certain circumstances, the [signatory countries] to extradite individuals to the other country, and establishes procedures to be followed when the Treaty is invoked." *Id.* at 664–65. Accordingly, the Court concluded that because the abduction was not in violation of the treaty, the manner in which the defendant was brought before the court was irrelevant, and jurisdiction existed. *See id.* at 662.

7

*Alvarez-Machain* is distinguishable from Graham's case not only because it involved an abduction and not an extradition from the asylum country, but also because the asylum country did not consent to the defendant's prosecution in that case. Nevertheless, to the extent Graham relies on *Alvarez-Machain* to argue that he has standing to raise an objection to his extradition, this Court agrees. The Supreme Court in *Alvarez-Machain* questioned the Ninth Circuit's holding and the government's argument that an abducted individual could only raise the issue if the offended government had formally protested to their prosecution. The Supreme Court explained:

> The Extradition Treaty has the force of law, and if, as respondent asserts, it is self-executing, it would appear that a court must enforce it on behalf of an individual regardless of the offensiveness of the practice of one nation to the other nation. In *Rauscher*, the Court noted that Great Britain had taken the position in other cases that the Webster-Ashburton Treaty included the doctrine of specialty, but no importance was attached to whether or not Great Britain had protested the prosecution of Rauscher for the crime of cruel and unusual punishment as opposed to murder.

*Alvarez-Machain*, 504 U.S. at 667. Furthermore, the Eighth Circuit has held that extradited individuals such as Graham "have standing to raise any objection that the surrendering country might have raised to their prosecution." *United States v. Lomeli*, 596 F.3d 496, 500 (8th Cir. 2010) (citing *Leighnor v. Turner*, 884 F.2d 385, 388 (8th Cir. 1989))[4]

Respondent argues, however, that Canada's consent or agreement to Graham's trial for premeditated murder and felony murder under South Dakota law waived any challenges Graham could make to such prosecution under the extradition treaty. There is support for Respondent's position. For example, in *United States v. Diwan*, 864 F.2d 715 (11th Cir. 1989), the Eleventh Circuit held that the extradited individual could only raise objections to prosecutions that Great Britain, the asylum nation, might consider a breach of the applicable treaty. Therefore, notwithstanding the defendant's extradition solely on theft-related offenses, in light of Great Britain's express consent, the defendant also could be tried for conspiracy to persuade a minor into

---

[4]Circuits are divided over whether a defendant has standing to assert rights under an extradition treaty. *See* Ha Kung Wong, Note, *The Extra in Extradition: The Impact of State v. Pang on Extraditee Standing and Implicit Waiver*, 24 J. Legis. 111 (1998) (discussing cases in favor of defendant extraditee having standing to challenge extradition and those holding to the contrary).

sexually explicit conduct even though she was not extradited for that offense. *See id.* at 721. The Eleventh Circuit held that the defendant's rights under the treaty were derivative to those of the asylum country. *Id.* at 721. Because Great Britain's Secretary of State for the Home Office, who had the ultimate authority to decide whether a fugitive should be extradited, confirmed that Great Britain did not object to prosecution of the defendant on all counts of the indictment, the Eleventh Circuit rejected the defendant's argument that the doctrines of specialty and dual criminality barred her prosecution on the non-theft offenses. *Id.* at 721 and n. 7.

Although cases like *Diwan* from other circuits might support Respondent's argument, the Court is not aware of a case from the Eighth Circuit holding that consent by the asylum country waives the defendant's standing to assert a right under an extradition Treaty, and other circuits have held that the asylum country's consent does not waive the defendant's standing. *See* Ha Kung Wong, Note, *The Extra in Extradition: The Impact of State v. Pang on Extraditee Standing and Implicit Waiver*, 24 J. Legis. 111 (1998) (discussing cases). Thus, the Court concludes that Canada's consent did not waive Graham's standing to raise any objection that Canada might have raised to his prosecution, including the dual criminality challenge.[5] The Court now will turn to the merits.

### 2. Merits of Graham's Dual Criminality Challenge

While specialty focuses on preventing prosecution for an offense for which the defendant was not extradited, "[t]he dual criminality requirement ensures that the charged conduct is considered criminal and punishable as a felony in both the country requesting the suspect and the country surrendering the suspect." *Ordinola v. Hackman*, 478 F.3d 588 n. 7 (4th Cir. 2007).

The dual criminality requirement of the *Treaty on Extradition between Canada and the United States of America* (the Treaty) is set forth in Article 2, as amended in 1974, which states: "(1) Extradition shall be granted for conduct which constitutes an offense punishable by the laws of both

---

[5]The Court notes that Graham was not able to raise the dual criminality challenge to the state felony murder charge in the Canadian courts because he was extradited based on the federal premeditated murder charge. Graham did not face the state felony murder charge until after he was extradited to the United States and after the federal premeditated murder charge was dismissed.

Contracting Parties by imprisonment or other form of detention for a term exceeding one year or any greater punishment." (Doc. 5, Exhibit 3.) Including a dual criminality clause eliminates the need for a specific list of extraditable offenses because the treaty makes it clear that as long as the offense is "punishable by the laws of both Contracting Parties," it is an extraditable offense.

Graham's repeated assertions that Canada does not prosecute felony murder suggests that he believes it is not his conduct that controls extradition, but the charging statute. That is contrary to United States Supreme Court authority on the requirements dual criminality. The Court has specifically held that the doctrine of dual criminality "does not require that the name by which the crime is described in the two countries shall be the same; nor that the scope of the liability shall be coextensive, or, in other respects, the same in the two countries. It is enough if the particular act charged is criminal in both jurisdictions." *Collins v. Loisel*, 259 U.S. 309, 312 (1922). *See also Kelly v. Griffin*, 241 U.S. 6, 13-14 (1916) (holding that even though the Canadian Criminal Code prohibited as perjury, false statements made in a judicial proceeding, "whether material or not," meaning that "some possible false statements might fall within the Canadian" law that would not otherwise be punishable in the United States, "[i]t is enough if the particular variety was criminal in both jurisdictions") (citing *Wright v. Henkel*, 190 U.S. 40, 60-61 (1903)). "Absolute identity is not required. The essential character of the transaction [must be] the same, and made criminal by both statutes." *See Wright*, 190 U.S. at 58.

Following the Supreme Court's guidance, courts addressing dual criminality challenges focus on the defendant's underlying conduct. *See, e.g., DeSilva v. DiLeonardi*, 125 F.3d 1110 (7th Cir. 1997) (if acts of the defendant are considered criminal in both nations, extradition is appropriate even if the requesting country does not have a criminal statute analogous to the one that makes the acts criminal in the United States)[6]; *Lo Duca v. United States*, 93 F.3d 1100, 1111-12 (2d Cir. 1996)

---

[6]Specifically addressing the dual criminality clause in the extradition treaty between the United States and Canada for purposes of determining whether defendants should be extradited from the United States to Canada pursuant to the Treaty, the Seventh Circuit in *DeSilva* explained:

If there is probable cause to believe that Anthony and his assistants committed a crime in Canada, and there is probable cause to believe that the conduct would have

(finding that the Italian crime of "association of mafia type" was sufficiently analogous to conspiracy and RICO laws here in the United States to satisfy the dual criminality requirement even though the Italian law was arguably unconstitutional in the United States in charging as a crime "mere membership in an association;" also stating that the conduct of the accused and not the statutory text controls when deciding dual criminality); *United States v. Sensi*, 879 F.2d 888, 894 (D.C. Cir. 1989) (the Restatement of Foreign Relations Law "makes clear that the focus is on the acts of the defendant, not on the legal doctrines of the country requesting extradition"); *Theron v. United States Marshal*, 832 F.2d 492, 497 (9th Cir. 1987) (noting that "for purposes of dual criminality, it is immaterial that South Africa's law is broader than the analogous bank fraud law in this country," by criminalizing the conduct of an insolvent for failing to disclose his insolvency when obtaining credit; "both laws can be used to punish the failure to disclose a loan applicant's liabilities to a bank when obtaining credit"), *abrogated on other grounds, United States v. Wells*, 519 U.S. 482 (1997).

The courts in the cases cited above were in a position of reviewing laws in the United States to determine if statutes exist in this country that would criminalize the conduct at issue and thus satisfy the dual criminality requirement. If so, the suspect could be extradited from the United States to the requesting country. The courts were not reviewing the laws of other countries to determine whether the conduct was criminal in those countries. Graham cites no authority for the proposition that this Court should review Canadian law in order to decide which laws there make Graham's conduct criminal in that country. Indeed, that was for the Canadian courts to decide because the

---

been criminal if committed in the United States, then extradition is appropriate. This is the "dual criminality" requirement. We focus on domestic law: "unless a plausible challenge is raised by the person sought, the authorities in the requested state will presume that the acts alleged constitute a crime under the law of the requesting state, and will consider whether the acts alleged constitute a crime under the law of the requested state." *Restatement (3d) of the Foreign Relations Law of the United States* § 476 comment d (1987); *see also In re Assarsson*, 635 F.2d 1237, 1244 (7th Cir. 1980) (discussing the dangers of delving into foreign law). If the acts of the accused are considered criminal in both nations, extradition follows even if the requesting country does not have a criminal statute analogous to the one that makes the acts criminal in the United States.

*DeSilva*, 125 F.3d at 1113-14.

surrendering country determines whether an offense is extraditable. *See Johnson v. Browne,* 205 U.S. 309, 316 (1907) ("[w]hether the crime came within the provision of the treaty was a matter for the decision of the [Canadian] authorities, and such decision was final by the express terms of the treaty itself"); *Gallo–Chamorro v. United States,* 233 F.3d at 1308; *United States v. Saccoccia,* 58 F.3d 754, 766 (1st Cir. 1995) ("courts are duty bound to defer to a surrendering sovereign's reasonable determination that the offense in question is extraditable"); *United States v. Van Cauwenberghe,* 827 F.2d 424, 429 (9th Cir. 1987).

During the extradition proceedings in Canada, the Canadian courts found that Graham's acts would justify committal for trial under Canadian law had they been committed there. *See United States of America v. Graham,* 2007 BCCA 345 at para 28, citing *United States of American v. Ferras* [2006] 2 S.C.R. 77 at para 46 (evidence must convince extradition judge that a case "could go to trial in Canada"). Later, after reviewing the charge against Graham under South Dakota's felony murder statute, the Canadian Minister of Justice agreed to Graham's prosecution under that statute. Courts give substantial deference to the surrendering country's determination that a charged offense is criminal in that country. *See Casey v. Dep't of State,* 980 F.2d 1472, 1477 (D.C. Cir. 1992) ("[A] foreign court's holding as to what that country's criminal law provides should not lightly be second-guessed by an American court-if it is ever reviewable. And the foreign court's understanding of the nature of the American charge is, in truth, inextricably intertwined with its reading of its own law."); *In re Assarsson,* 635 F.2d 1237, 1244 (7th Cir. 1980) ("We often have difficulty discerning the laws of neighboring States, which operate under the same legal system as we do; the chance of error is much greater when we try to construe the law of a country whose legal system is much different from our own. The possibility of error warns us to be even more cautious of expanding judicial power over extradition matters.").

Graham argues, however, that the Canadian Minister of Justice "has no authority to waive Graham's legal rights," emphasizing that the Canadian Minister of Justice is a prosecutor and not a judge. (*See* Doc. 40 at 7.) This suggests that Graham believes the Canadian Minister of Justice had no authority to give Canada's consent to Graham's prosecution for premeditated murder and

felony murder under South Dakota law.  But Graham cites no legal authority and nothing in the record suggests that the Minister of Justice lacks such authority.

An examination of extradition law in the United States supports the proposition that the Canadian Minister of Justice has authority to consent to the trial of a Canadian citizen for felony murder in the United States.  In the United States, courts recognize that the ultimate decision to extradite is essentially a political one better made by the branch of government that has primary responsibility for conducting foreign affairs. *See, e.g., United States v. Kin–Hong*, 110 F.3d 103, 109 (1st Cir. 1997) (discussing how the two-step procedure established in the United States' extradition statutes, 18 U.S.C. §§ 3184 and 3186, divides responsibility for extradition between a judicial officer and the Secretary of State).  Once the court certifies that the fugitive is extraditable and any habeas review has concluded, the Secretary of State ultimately decides whether the fugitive actually will be surrendered to the requesting country. *See* 18 U.S.C. § 3186. In determining whether a fugitive should be extradited, the Secretary may consider de novo any issues raised before the extradition court. *Kin–Hong*, 110 F.3d at 110. The Secretary may also consider humanitarian and foreign policy factors, the ability to attach conditions to a surrender, and diplomatic methods available to obtain fair treatment. *See id.* at 111.

This bifurcated process between the judiciary and the executive branch reflects that extradition proceedings contain legal issues particularly suited for judicial resolution, such as standards of proof, sufficiency of evidence, and treaty construction, "yet simultaneously implicate questions of foreign policy, which are better answered by the executive branch." *Id.* at 110. "Both institutional competence rationales and our constitutional structure, which places primary responsibility for foreign affairs in the executive branch, support this division of labor." *Id.* (citing *United States v. Curtiss–Wright Export Corp.*, 299 U.S. 304, 319–322 (1936)). *See also Peroff v. Hylton*, 563 F.2d 1099, 1102 (4th Cir. 1977) ("The need for flexibility in the exercise of Executive discretion is heightened in international extradition proceedings which necessarily implicate the foreign policy interests of the United States. Thus, while Congress has provided that extraditability shall be determined in the first instance by a judge or magistrate, 18 U.S.C. § 3184, the ultimate decision to extradite is 'ordinarily a matter within the exclusive purview of the Executive.'"). If a

similar procedure exists in Canada, it follows that the Minister of Justice had authority to consent to Graham's trial on felony murder charges in the United States. Graham has given this Court no reason to disturb either the Canadian courts' initial determination that the conduct charged against Graham is criminal under Canadian law and therefore extraditable, or the Minister of Justice's subsequent decision to consent to Graham's prosecution for premeditated murder and felony murder under South Dakota law.

Graham criticizes Respondent's reliance on *Clarey v. Gregg*, 138 F.3d 764 (9th Cir. 1998), but the Court finds the Ninth Circuit's reasoning in *Clarey* instructive. In that case, Clarey challenged his extradition from the United States to Mexico on murder charges, contending that his extradition would violate the doctrine of dual criminality because the homicide statute under which he was charged in Mexico criminalized a much broader range of conduct than the United States felony murder statute. *See id.* at 765. Clarey argued that the two statutes were not "substantially analogous" because the United States statute requires that the homicide be perpetrated during the commission of a violent felony, while the Mexican law requires only that a homicide occur. *Id.* In rejecting Clarey's argument, the Ninth Circuit clarified the degree of similarity that must exist between the laws of two countries in order to satisfy the dual criminality requirement, stating Clarey's challenge overstates the degree to which the applicable criminal laws of the two countries must be "substantially analogous." *Id.* The Ninth Circuit ruled that although some analogy is required, differences between statutes aimed at the same category of conduct do not defeat dual criminality. *Id.* The *Clarey* court observed that both the Mexican homicide statute and the United States felony murder statute could be used to punish the acts with which Clarey was charged, *i.e.*, causing a death by a beating during a robbery, and held that the laws were analogous because, "they both punish acts of the same general character—the taking of another's life." *Id.* at 766. The Ninth Circuit added, "[N]o more is required." *Id.*

Graham argues that *Clarey* is inapplicable because his conduct "would not constitute any kind of murder in Canada" when felony murder is not prosecuted in that country. (Doc. 35 at 7.) Graham would have the Court ignore the nature of the charged conduct and focus solely on the fact that Canada does not prosecute felony murder but, as shown above, the cases uniformly state that

14

the key to determining whether the laws are "substantially analogous" is the "essential character" of the acts criminalized. *See, e.g., Wright v. Henkel*, 190 U.S. at 58. Even if the Canadian courts have declared Canada's felony murder statute unconstitutional, the courts have not held all laws prohibiting kidnapping and murder unconstitutional. No one can argue that the acts Graham committed, whether or not he is guilty of firing the shot that killed Anna Mae Aquash, would not be criminalized in Canada. Even if Canada no longer enforces its felony murder statute, it punishes acts of the same character as Graham's.

Applying the reasoning of legal authority on dual criminality, and having found no relevant authority to the contrary, this Court finds that the dual criminality provision of the Treaty has been satisfied. On the basis of Graham's conduct, it was appropriate for Canada to allow Graham's prosecution in the United States, under South Dakota law, even if Canada does not enforce its felony murder statute.

Nothing in the decisions of the South Dakota Supreme Court and the state habeas court finding that the trial court had jurisdiction over the State's prosecution of Graham for felony murder was either "contrary to" or "involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Thus Graham is not entitled to habeas relief on his dual criminality claim.

Given the lack of authority addressing whether an asylum country's consent to trial and punishment, if convicted, in the United States for a crime (such as felony murder) that is no longer prosecuted in the asylum country violates the dual criminality provision in the treaty between the asylum country and the United States, the Court will grant Graham a certificate of appealability on this issue.

## B. Claims 2 and 4: Felony Murder Statute and Kidnapping Jury Instructions

In Claim 4, Graham argues that because the felony murder statute under which he was indicted had been repealed, the trial court had no jurisdiction over the offense and his conviction is invalid.

At the time of Aquash's murder, South Dakota's felony murder statute provided: "Homicide is murder when perpetrated without any design to effect death by a person engaged in the commission of any felony." SDCL 22-16-9. The statute was repealed in 2005.[7]

Graham incorrectly argues that the repealed statute does not apply to his 1975 crime. The statute in effect at the time of the violation is the applicable statute. At common law, the repeal of a criminal statute abated a prosecution that had not reached final disposition, but Congress enacted a general savings statute in order to avoid such abatements, which were often inadvertent.[8] *United States v. Smith*, 632 F.3d 1043, 1048-49 (8th Cir. 2011) (the general savings statute required application of the penalties in place at the time the crime was committed unless the repealing statute explicitly provides otherwise; the repeal of a criminal statute does not abate the underlying offense with respect to acts committed prior to repeal).

The language of South Dakota's general savings statute is almost identical to the federal general savings statute:

> The repeal of any statute by the Legislature shall not have the effect to release or extinguish any penalty, forfeiture, or liability incurred under such statute unless the repealing act shall so expressly provide, and such statute shall be treated as still remaining in force for the purpose of sustaining any proper action or prosecution for the enforcement of such penalty, forfeiture, or liability.

SDCL § 2-14-18. The general savings clause expresses the South Dakota Legislature's intent that conduct remain subject to punishment even if a statute imposing criminal liability is repealed. *See, e.g., State v. Means*, 268 N.W.2d 802 (S.D. 1978) (criminal liability under repealed SDCL 22-10-4

---

[7] Exhibit 7 attached to Graham's Memorandum, doc. 5, sets out the language of Senate Bill 43 which repealed SDCL 22-16-9.

[8] The federal general savings statute provides:
The repeal of any statute shall not have the effect to release or extinguish any penalty, forfeiture, or liability incurred under such statute, unless the repealing Act shall so expressly provide, and such statute shall be treated as still remaining in force for the purpose of sustaining any proper action or prosecution for the enforcement of such penalty, forfeiture, or liability.
1 U.S.C. § 109.

was preserved by SDCL 2-14-18 as to offenses committed prior to repeal) (citing *United States v. Reisinger*, 9 S.Ct. 99 (1888)). *See also People v. McDonald*, 163 N.W.2d 796 (Mich. App. 1968) (where amendment eliminated the distinction between nighttime and daytime breaking and entering and reduced the maximum term of punishment, court relied on general savings statute and rejected defendant's argument that prosecution was precluded under the statute as it existed prior to amendment); *State v. Johnson*, 402 A.2d 876, 879 (Md. 1979) ("Where penalties, rights or liabilities incurred or accrued under a prior version of a statute would otherwise be extinguished by its repeal, most legislatures have enacted general savings statutes which have the effect of continuing a repealed statute in force for the purpose of punishing offenses committed prior to repeal. Thus, a general savings statute preserves penalties imposed under prior law except where a subsequent repealing act manifests the legislative intention to the contrary.").

Because Senate Bill 43, which repealed SDCL 22-16-9, does not expressly provide for abatement, the general savings provision applies and the repeal of the statute has no effect on Graham's acts which occurred prior to the date of the statute's repeal.

For these same reasons, Graham's argument in Claim 2 that the trial court's kidnapping jury instruction was incorrect is also rejected. The underlying felony for Graham's conviction for murder is kidnapping in violation of SDCL 22-19-1. The jury was instructed on the 1975 version of the kidnapping statute:

> The elements of the crime of kidnapping, each of which the state must prove beyond a reasonable doubt, are, at the time and place alleged:
>
> 1. The defendant did seize, confine, kidnap, abduct or carry away Anna Mae Aquash
>
> 2. The seizing, confining, kidnapping, abducting or carrying away of Anna Mae Aquash was for the purpose of ransom, reward or other purpose.

(Doc. 5, Exhibit 5.) The 1975 version of SDCL 22-19-1 "was intended to and does outlaw kidnapping regardless of the purpose of the restraint...." *State v. Strauser*, 63 N.W.2d 345, 347 (S.D. 1954).

Graham argues that the jury should have been instructed on the version of South Dakota's kidnapping statute in effect when he was indicted in 2009. That version of the statute requires the prosecutor to prove one of the purposes listed:

> Any person who, either unlawfully removes another person from the other's place of residence or employment, or who unlawfully removes another person a substantial distance from the vicinity where the other was at the commencement of the removal, or who unlawfully confines another person for a substantial period of time, with any of the following purposes:
>
> (1) To hold for ransom or reward, or as a shield or hostage; or
>
> (2) To facilitate the commission of any felony or flight thereafter; or
>
> (3) To inflict bodily injury on or to terrorize the victim or another; or
>
> (4) To interfere with the performance of any governmental or political function; or
>
> (5) To take or entice away a child under the age of fourteen years with intent to detain and conceal such child;
>
> is guilty of kidnapping in the first degree. Kidnapping in the first degree is a Class C felony, unless the person has inflicted serious bodily injury on the victim, in which case it is aggravated kidnapping in the first degree and is a Class B felony.

SDCL § 22-19-1. Graham contends that the instruction given to the jury permitted them to convict him without a finding of one of the purposes listed above, which is an essential element of kidnapping as defined in the 2009 statute.

As explained above, the statute in effect at the time of the offense is the applicable law, not the statute in effect at the time of the indictment, unless the new version of the statute provides for abatement of prosecution under the older version. Graham has made no showing that the amended version of SDCL 22-19-1 provides for abatement, thus the general savings provision applies. Therefore, the amended version of the statute has no effect on Graham's acts which occurred prior to the date of the amendment. *See, e.g., State v. Brewster*, 218 P.3d 249, 250 (Wash. App. 2009) ("The saving clause applies only to criminal and penal statutes, presumptively "saving" all offenses already committed and all penalties or forfeitures already incurred from the effects of amendment

18

or repeal, and requiring that crimes be prosecuted under the law in effect at the time they were committed."). Accordingly, the state court's finding that the jury was appropriately instructed as to kidnapping was not contrary to, nor did it involve an unreasonable application of, clearly established federal law.

### C. Claim 3: Combining felony murder with kidnapping in one count was duplicitous, and the jury should have been allowed to consider whether Graham was guilty of lesser included offense of kidnapping only.

#### 1. Duplicity

Graham asserts that charging him with felony murder and kidnapping in one count is duplicitous in violation of the Sixth Amendment right to jury unanimity.[9] Graham's argument misses the mark. The first count in the indictment charged:

> That on or about the 10th through the 12th day of December, 1975, in the county of Pennington, State of South Dakota, John Graham a/k/a John Boy Patton and Thelma Rios did commit and aid and abet the public offense of MURDER WHILE IN THE COMMISSION OF ANY FELONY in that they did perpetrate and cause the death of Anna Mae Aquash without any design to effect the death of Anna Mae Aquash while they were engaged in the commission of any felony, to wit: kidnapping, in violation of SDCL 22-16-9, SDCL 22-19-1.

(Doc. 5, Exhibit 6.) This language in the Indictment charges Graham with felony murder; it does not charge him with kidnapping. Kidnapping is mentioned in the charge because the felony murder statute requires proof that the defendant had the requisite intent to commit and did commit the underlying felony; in order to be found guilty of felony murder there must be a factual finding that it was committed in conjunction with an underlying felony, in this case kidnapping. *See State v. Rough Surface*, 440 N.W.2d 746, 759 (S.D. 1989) (to be guilty of felony murder, death must have occurred while defendant was engaged in the perpetration of an underlying felony). Count 1 of the Indictment is not duplicitous and Graham's argument to the contrary is rejected.

---

[9]The state habeas court denied Graham's duplicity claim because he failed to raise it on direct appeal.

To the extent Graham argues that being indicted on the underlying felony of kidnapping is a requisite to conviction for felony murder in South Dakota, that argument is also rejected. The South Dakota felony murder statute does not require a charge of an underlying felony. While frequently defendants are indicted and tried for both felony murder and the underlying felony,[10] that is not always the case. *See United States v. Greene*, 834 F.2d 1067, 1071 (D.C. Cir. 1987). Cases from other jurisdictions indicate that a charge of the underlying felony is not necessary to sustain a conviction of felony murder. *See, e.g., Greene*, 834 F.2d at 1071-72 (under District of Columbia law, there is no requirement to indict or convict a defendant on an underlying felony in order to secure a conviction for felony murder); *State v. Wise*, 697 P.2d 1295, 1300 (Kan. 1985) ("We hold that under our statute, K.S.A. 21-3401, an accused need not be prosecuted [for] or convicted of the underlying felony in order to be convicted of felony murder."); *State v. Wroblewski*, 489 N.Y.S.2d 797, 802 (1985) (it is "settled" that a felony murder conviction may stand even if the underlying felony which serves as its predicate was not submitted to the jury, or had been dismissed, or had not been charged separately in the indictment); *Commonwealth v. Giles*, 456 A.2d 1356, 1359 (Pa. 1983) ("Where a murder is alleged to have been committed in the perpetration of a felony, there is no requirement that the defendant actually be charged with the underlying felony."); *Commonwealth v. Hainds*, 448 Pa. 67, 292 A.2d 337 (Pa. 1972) (Supreme Court of Pennsylvania has "repeatedly held that where murder is alleged to have been committed in the perpetration of a felony, perpetration of that felony need not be set forth in the indictment").

Because no requirement exists under South Dakota law that the prosecutor, when indicting felony murder, also must indict the underlying felony, Count 1 of the Indictment against Graham is consistent with state law, and Graham has failed to show a violation of the Constitution or laws of the United States.

---

[10]For example, in *State v. Garza*, 854 N.W.2d 833 (S.D. 2014), the defendant was prosecuted and convicted of both felony murder and the underlying felony of arson after he burned a building which resulted in a death. The South Dakota Supreme Court rejected the defendant's habeas claim that imposition of sentences for both the felony murder and the underlying felony of arson violated the Double Jeopardy Clause.

### 2. Kidnapping

Graham asserts that the jury should have been allowed to consider whether he was guilty of what he refers to as the "lesser included offense" of kidnapping. Graham cites no authority for the proposition that, under South Dakota law, the underlying felony is a lesser included offense of felony murder. *State v. Garza*, 854 N.W.2d 833 (S.D. 2014), suggests otherwise. There, the South Dakota Supreme Court held that the underlying arson felony was not a lesser included offense of felony murder for the purpose of double jeopardy because each offense contains an element not contained in the other. *Id.* at 839. The court concluded that the South Dakota Legislature intended felony murder and arson to be separate offenses for the purpose of imposing multiple punishments. *Id.* at 841.

The South Dakota Supreme Court has explained that an offense is a lesser included offense if:

> (1) ... the elements of the included offense are [the same or] lesser in number than the elements of the greater offense;
>
> (2) the penalty for the lesser-included offense must be less than that of the greater offense; and
>
> (3) both offenses must contain common elements so that the greater offense cannot be committed without also committing the lesser offense.
>
> The legal test also requires that the essential elements of the lesser offense must be incorporated into the corpus delicti of the greater offense.

*State v. Hoadley*, 651 N.W.2d 249, 260 (S.D. 2002) (citations omitted).

The elements of the predicate felony of kidnapping are not included in the greater offense of felony murder. Kidnapping requires proof of elements not required to establish felony murder. Kidnapping requires a mental state and a kidnapping; felony murder does not. It is possible to commit the offense of felony murder without first committing the offense of kidnapping. Therefore, kidnapping is not a lesser included offense of felony murder, and it would have been error for the trial court to instruct the jury that they could find Graham guilty of kidnapping only.

21

Graham argues that the jury did not find intent to kill Aquash because they found him not guilty of premeditated murder and, therefore, Graham did not have the mens rea for felony murder and the jury might have convicted him only of kidnapping if it had been given the opportunity to do so. Unlike premeditated murder, felony murder does not require that the defendant intend to kill, so long as the defendant is involved in the underlying felony. *See State v. Roubideaux*, 755 N.W.2d 114, 119 (S.D. 2008) (comparing felony murder which only requires effectuation of a death during felony with premeditated murder requiring a "premeditated design to effect the death of the person killed"). Felony murder – but not premeditated murder – requires proof that the defendant had the requisite intent to commit and did commit the underlying felony. *See State v. O'Blasney*, 297 N.W.2d 797, 798-99 (S.D. 1980). Premeditated murder, however, demands an intent to kill as well as premeditation, neither of which is required to prove felony murder. Accordingly, the jury could find Graham guilty of felony murder even if he did not intend to kill Anna Mae Aquash.

The jury had strong evidence before it from which it could find that Graham kidnapped Aquash. There is also persuasive evidence that the homicide took place during the commission of the kidnapping. That a jury found that Graham did not commit Aquash's murder with premeditation but that it happened in the commission of a felony is not inconsistent. If the jury had believed either that Graham was not involved in the kidnapping or that the murder did not occur during the commission of the kidnapping, the jury would have found Graham not guilty.

The clearly established federal law Graham relies on in support of his claim that the jury should have been instructed and allowed to convict him of kidnapping only is *Beck v. Alabama*, 447 U.S. 625 (1980). *Beck* is inapposite. The Supreme Court has explained its holding in *Beck*:

> In *Beck*, the defendant was indicted and convicted of the capital offense of [r]obbery or attempts thereof when the victim is intentionally killed by the defendant. Although state law recognized the noncapital, lesser included offense of felony murder, and although lesser included offense instructions were generally available to noncapital defendants under state law, the Alabama death penalty statute prohibited such instructions in capital cases. As a result, Alabama juries had only two options: to convict the defendant of the capital crime, in which case they were required to impose the death penalty, or to acquit. We found that the denial of the third option

22

of convicting the defendant of a noncapital lesser included offense diminish[ed] the reliability of the guilt determination. Without such an option, if the jury believed that the defendant had committed some other serious offense, it might convict him of the capital crime rather than acquit him altogether. We therefore held that Alabama was constitutionally prohibited from withdrawing that option from the jury in a capital case.

*Hopkins v. Reeves*, 524 U.S. 88, 94–95 (1998) (internal quotations and citations omitted). The Court went on to explain:

In *Beck*, the death penalty was automatically tied to conviction, and Beck's jury was told that if it convicted the defendant of the charged offense, it was required to impose the death penalty. This threatened to make the issue at trial whether the defendant should be executed or not, rather than whether the State ha[d] proved each and every element of the capital crime beyond a reasonable doubt. In addition, the distortion of the trial process carried over directly to sentencing, because an Alabama jury unwilling to acquit had no choice but to impose the death penalty. There was thus a significant possibility that the death penalty would be imposed upon defendants whose conduct did not merit it, simply because their juries might be convinced that they had committed some serious crime and should not escape punishment entirely.

*Hopkins*, 524 U.S. at 98 (internal quotation and citations omitted). *See also Schad v. Arizona*, 501 U.S. 624, 646–47 (1991) (emphasizing that *Beck's* core concern was to eliminate the "distortion of the factfinding process that is created when the jury is forced into an all-or-nothing choice between capital murder and innocence"). The concerns in *Beck* are not implicated in Graham's case. Graham's jury did not face an all-or-nothing choice between capital murder and innocence.

The felony murder instruction in Graham's case is entirely proper, and *Beck* did not require the trial court to give the jury an option to find Graham guilty of kidnapping only. Graham is not entitled to habeas relief on this claim.

**D. Claim 5: Graham did not get a fair trial.**

Graham first argues that he did not receive a fair trial because his trial lawyer provided ineffective assistance by failing to present the background of the case or any of Graham's witnesses in order to explain alternative theories of Anna Mae Aquash's death.

A claim of ineffective assistance of counsel is governed by the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). "This standard requires [the applicant] to show that his 'trial counsel's performance was so deficient as to fall below an objective standard of reasonable competence, and that the deficient performance prejudiced his defense.'" *Nave v. Delo*, 62 F.3d 1024, 1035 (8th Cir. 1995) (quoting *Lawrence v. Armontrout*, 961 F.2d 113, 115 (8th Cir. 1992)). This analysis contains two components: a performance prong and a prejudice prong.

> Under the performance prong, the court must apply an objective standard and determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance while at the same time refraining from engaging in hindsight or second-guessing of trial counsel's strategic decisions. Assuming the performance was deficient, the prejudice prong requires proof that there is a reasonable probability that, but for a counsel's unprofessional errors, the result of the proceeding would have been different.

*Id.* (internal quotations and citations omitted). Failure to satisfy both prongs is fatal to the claim. *Pryor v. Norris*, 103 F.3d 710, 713 (8th Cir. 1997) (no need to "reach the performance prong if we determine that the defendant suffered no prejudice from the alleged ineffectiveness").

The South Dakota state habeas court recognized *Strickland* as the governing authority. The court focused on the ultimate *Strickland* prejudice inquiry when it concluded that Graham did not meet his burden to show that "there is a reasonable probability that the result would have been different absent counsel's alleged errors." (Doc. 5, Exhibit 9, State Court Habeas Decision.) The court quoted from a case holding that "there is no prejudice if, factoring in the uncalled witnesses, the government's case remains overwhelming." *Id.* (quoting *Knecht v. Weber*, 640 N.W.2d 491, 500 (S.D. 2002)). Thus, the state court found that failing to present the background of the case or any of Graham's witnesses in order to explain alternative theories of Anna Mae Aquash's death did not result in prejudice to Graham.

24

The Supreme Court has emphasized that the deference due the state courts applies vigorously to decisions involving ineffective assistance of counsel claims. *See Knowles v. Mirzayance*, 556 U.S. 111 (2009). In *Knowles*, the Supreme Court reversed the Ninth Circuit and held that the decision of the California Court of Appeals--finding that the defendant was not deprived of effective assistance of counsel when his attorney recommended withdrawing his insanity defense during second phase of trial--was not contrary to or an unreasonable application of clearly established federal law. *See id.* at 121-122. The Court also concluded that there was no reasonable probability that, but for counsel's alleged error, the result of the proceeding would have been different. *Id.* at 127-128. *Knowles* stressed the "doubly deferential judicial review that applies to a *Strickland* claim evaluated" by a federal court in a § 2254 habeas. *Id.* at 123.

> The question is not whether a federal court believes the state court's determination under the *Strickland* standard was incorrect but whether that determination was unreasonable—a substantially higher threshold. And, because the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard. *See Yarborough v. Alvarado*, 541 U.S. 652, 664, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004) ("[E]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations").

*Knowles*, 556 U.S. at 123.

In the present case, the state habeas court determined that the result of the trial would not have been different had the witnesses identified by Graham testified at trial. This is the analysis demanded by *Strickland*. Accordingly, the South Dakota court's decision is not "contrary to" settled law, and this Court must apply AEDPA deference to the state court's resolution of the issue. The Court next turns to the question whether the state court unreasonably applied *Strickland* on the facts before it. *See Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) ("[R]eview under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits.").

The Petitioner briefly raised the inadequate representation claim before the state habeas court with the following statement in his Memorandum of Law in Support of his application for the Writ of Habeas Corpus in the Circuit Court of the Seventh Judicial Circuit of South Dakota:

25

There's an alternative theory as to what happened to Anna Mae Aquash that the jury should have had the opportunity to consider. The Aquash murder occurred in the context of approximately sixty three well-documented deaths on the Pine Ridge reservation during a three year period, and many more than that, for one reason or another, were never reported. Price v. Viking Press, 625 F.Supp. 641, 643 (D.Minn. 1985). Many people in the Pine Ridge community attributed them to an armed organization called the Guardians Of the Oglala Nation (GOON), which was organized and run by the FBI to enforce Federal law on the reservation.

The jury would have been alarmed to learn that in the first autopsy of Anna Mae Aquash, supervised by FBI Agent David Price, the coroner found that she died from freezing to death, and not from the gunshot wound to her head, as a second autopsy determined was the real reason. This alone would have created a reasonable doubt as to the government's version of events, particularly in the context of a series of 60 murders.

Agent Price, who knew Aquash personally and once allegedly threatened her life, was widely believed responsible by people on the Pine Ridge reservation at the time. At least three books have been written about this, including In the Spirit of Crazy Horse by Peter Matheissen, The Unquiet Grave by Steve Hendricks, and The Life and Death of Anna Mae Aquash by Johanna Brand. Peter Mattheissen's book was the subject of a meritless defamation suit by Agent Price, that cost Viking Press more than a million dollars to defend before it was dismissed. See David Price v. Viking Penguin, Inc., and Peter Matthiessen, 881 F.2d 1426 (8th Cir. 1989). According to Price, the "book accuses him of, among other things, complicity in the murder of an AIM member [Anna Mae Aquash] and in the alleged coverup of that murder, knowingly suborning perjury, violating constitutional rights by illegal investigative and harassment activities, failing to investigate major crimes on Pine Ridge, and threatening witnesses with physical harm." Price v. Viking Press, 625 F.Supp. 641, 643 (D.Minn. 1985).

Agent Price was available as a witness, and named as one by both prosecution and defense, but was never called. In fact, Graham's court-appointed attorney called no witnesses, even though Mr. Price, Mr. Peterson (the coroner who performed the second autopsy) and other crucial witnesses were available. The jury never heard about any of this, even though it's been litigated in the Eighth Circuit and is well known on Pine Ridge.

Graham's State Court Habeas Brief at p. 20-22. Petitioner also made this statement to this Court in his Memorandum in support of this § 2254 habeas petition, with an additional claim that Ms. Wilma Blacksmith should have been called as a witness. *See* Doc. 5 at p. 24-26. Regarding Ms. Blacksmith, Petitioner states, "Graham and Ms. Blacksmith were told that Ms. Blacksmith was going to be called as a witness, but she wasn't. Ms. Blacksmith would have testified that she was in contact with

Aquash after the date on which the government says she was killed." *Id.* at 26. This Court could not find a reference to Ms. Blacksmith in Petitioner's state court habeas brief.

The Petitioner also claimed in a footnote in his briefs before the state habeas court and this Court that at various times he requested that his lawyer, John Murphy, move for a change of venue and no change of venue was requested:

> In addition to failing to call any of the obvious witnesses or mention any of the well-known alternative theories of the murder, Graham's trial attorney never moved the court for a change in venue, despite Graham's urging him on this point. The majority white community in Pennington County discriminates against Native Americans, and many harbor negative views of the American Indian Movement in particular.

Graham's State Court Habeas Brief at p. 22 n. 22; *see also* Doc. 5, p. 25 n. 23.

The analysis of these claims of inadequate representation based upon the record is made more difficult as the state habeas trial court did not take any evidence, nor were any affidavits filed with that Court. The opinion of the state trial court on the inadequate representation issue is conclusory, with little analysis, the entire discussion of that issue being as follows:

### 5. Graham did not receive a fair trial.

Petitioner's final argument is that he did not receive a fair trial because the jury didn't hear the background of the case or any of Graham's witnesses and there was no evidence presented of his guilt other than the testimony of co-conspirators and informants.

#### a. Background of the case

Petitioner claims that he should have been able to present evidence that the FBI or Agent Price were responsible for Aquash's death. More specifically, he contends that trial counsel was ineffective for "failing to call any of the obvious witnesses or mention any of the well-known alternative theories of the murder[.]"

A petitioner shoulders a heavy burden of proof in an ineffective assistance of counsel claim. *Coon v. Weber*, 2002 S.D. 48, 11 N.W.2d 638, 642. "A claim of ineffective assistance of counsel presents a mixed question of law and fact and must be reviewed under the two-prong test announced in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed. 674 (1984)." *Dillon v. Weber*, 2007 S.D. 81, 737 N.W.2d 420, 424.

"Under the first prong, the petitioner must show that counsel's errors were so serious that he was not functioning as counsel guaranteed under the Constitution." Id. (citing *Denoyer v. Weber*, 2005 SD 43, 694 N.W.2d 848, 855 (citations omitted)). This requires a petitioner to demonstrate that counsel's representation failed to satisfy an objective standard of reasonableness. Id. (citing *Owens v. Russell*, 2007 S.D. 3, 726 N.W.2d 610). "The second prong 'requires a showing of serious prejudice such that the errors deprived the defendant of a fair trial.'" Id. (quoting *Denoyer*, 2005 S.D. at ¶19). Prejudice exists only where "there is a reasonable probability that but for counsel's errors, the result of the proceeding would have been different." Id. (citing *Owens*, 2007 S.D. at ¶¶ 8-9).

Petitioner has not met his burden showing that there is a reasonable probability that the result would have been different absent counsel's alleged errors.

"Conjecture or speculation is not sufficient to establish the required prejudice flowing from the failure to call a witness to testify." *Id.* at 876. We have previously agreed with this proposition. As stated in *Siers v. Class*, "there is no prejudice if, factoring in the uncalled witnesses, the government's case remains overwhelming." 1998 S.D. 77, ¶ 27, 581 N.W.2d 491, 497 (citation omitted).

*Knecht v. Weber*, 2002 S.D. 21, 640 N.W.2d 491. Therefore, Petitioner's claim that he did not have a fair trial because he was not able to present evidence must also fail.

Doc. 1-10 at p. 7-8.

After the state habeas court denied Graham's petition, Graham timely filed a pro se motion for a certificate of probable cause with the South Dakota Supreme Court. But because he failed to serve a copy of the motion on the attorney general, the South Dakota Supreme Court dismissed the motion for a certificate of probable cause and refused to hear Graham's appeal. Thus there is no South Dakota Supreme Court opinion on the merits of Graham's state habeas corpus claims.

Given this record, this Court has read the trial transcript of *South Dakota v. Graham*, CR 09-3953. In reading that transcript, it is clear that defense counsel in his cross examination and objections had an excellent command of this case, including the facts in controversy. Attorney Murphy also had a good command of the record in two previous related cases, the first being the 2004 trial of Arlo Looking Cloud in Federal District Court in Rapid City, South Dakota, *see United States v. Looking Cloud*, 419 F.3d 781 (8th Cir. 2005), and the 2010 trial of *United States v. Vine Richard Marshall*, CR 08-50079-02, also in Federal District Court in South Dakota. The *Looking*

*Cloud* trial involved the same facts as were involved in the *Graham* trial. The *Marshall* case involved whether or not on the night that Anna Mae Aquash was killed Dick Marshall gave a revolver to John Boy Graham and Theda Clarke and Arlo Looking Cloud when they showed up at Dick Marshall's house with Anna Mae Aquash as their prisoner. This Court tried both of those jury cases. Witnesses from those cases were key prosecution witnesses in the *Graham* trial. The prosecution witnesses in the *Graham* trial were effectively cross-examined.

As for the issue of whether or not Attorney Murphy should have asked for a change of venue, the record itself is silent other than the claim quoted above as to whether he ever in fact received such a request. Assuming for purposes of discussion that a request for change of venue was made by Graham, then making such a change of venue demand could be one of those situations where, watch out for what you wish for because you might get it. Such a possibility has to be considered in deciding tactically whether or not to demand a change of venue. The *Graham* trial was venued in Pennington County which has its 100,948 population primarily in Rapid City, South Dakota. Rapid City is a town of 67,956 as of the 2010 census and all of the surrounding counties in the Seventh Judicial Circuit are more rural and would likely be less favorable venues than Pennington County, as would be the case with most other counties in South Dakota. John Murphy, as defense counsel with his office in Rapid City, would be better able to assess the desirability of whether to request a change of venue, or not.

With regard to calling Ms. Blacksmith, the fact that she claimed to have seen Anna Mae Aquash some time after the night she was supposed to have been killed by John Boy Graham came into evidence through cross-examination of Candy Hamilton. We do not know whether Ms. Blacksmith would have confirmed that fact if called to the stand. As for calling F.B.I. Agent Price as a witness, it is hard to imagine how any testimony Agent Price would give could have been beneficial to the Graham defense. *See Price v. Viking Penguin, Inc.*, 881 F.2d 1426 (8th Cir. 1989) (affirming dismissal of Agent Price's defamation action by district court, Judge Diana E. Murphy, at 676 F.Supp. 1501).

29

The record before the state court is sufficient to assure this Court that the state habeas court did not unreasonably apply *Strickland* to the facts before it. It is not unreasonable to conclude that the result of the trial would not have been different had the witnesses identified by Graham testified at trial or if a change of venue had been requested. Because the South Dakota court's assessment of the prejudice prong of this ineffective assistance of counsel claim is not unreasonable and not contrary to federal law, it is entitled to deference from this Court.

Next, Graham argues that his conviction was not supported by sufficient evidence because it was based solely on uncorroborated co-conspirator and informant testimony. This argument was rejected by the South Dakota Supreme Court on Graham's direct appeal.

The Eighth Circuit recently reiterated the narrow standard of review in § 2254 habeas cases for challenges to the sufficiency of the evidence:

> In *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), the Supreme Court articulated a narrow standard of review for questions of sufficiency of the evidence. Under *Jackson*, a habeas petitioner is entitled to relief if we conclude "that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Id.* at 324, 99 S.Ct. 2781. In applying this standard, we do not re-weigh the evidence, and we must resolve inconsistencies in favor of the prosecution. *Id.* at 319, 99 S.Ct. 2781. Under AEDPA, "we may grant relief only if we find the [Missouri Supreme Court's] conclusion that the evidence satisfied the *Jackson* sufficiency of the evidence standard 'both incorrect and unreasonable.' " *Garrison v. Burt*, 637 F.3d 849, 855 (8th Cir. 2011) (quoting *Cole v. Roper*, 623 F.3d 1183, 1187 (8th Cir. 2010)).

*Nash v. Russell*, 807 F.3d 892, 897 (8th Cir. 2015), *cert. denied*, — U.S. —, 136 S.Ct. 1825 (2016). In *Nash*, the court listed the evidence noted by the Missouri Supreme Court that could allow the jury to draw inferences leading to the defendant's guilt. The Eighth Circuit held that the state court did not unreasonably apply the *Jackson* principle. The Eighth Circuit stated that "the jury certainly could have resolved the conflicting evidence in Nash's favor," but the court is "bound by *Jackson* to view the facts in the light most favorable to the prosecution and defer to the state courts where there is some evidence by which a 'rational trier of fact could have found proof of guilt beyond a reasonable doubt.'" *Id.* (quoting *Jackson*, 443 U.S. at 324).

30

In the present case, a number of pieces of evidence support the jury's guilty verdict on felony murder. Arlo Looking Cloud testified that the kidnapping occurred in Denver and ended with Graham shooting and killing Aquash about two days later. Three other witnesses testified about the kidnapping of Aquash in Denver. In a taped interview, Graham admitted that he drove Aquash from Denver to South Dakota. Cleo Gates and Richard Marshall placed Graham and Aquash at their house in Allen, South Dakota prior to the murder. As such, the South Dakota court's conclusion that Graham's conviction was supported by sufficient evidence is neither incorrect nor unreasonable. Therefore, Graham is not entitled to habeas relief on this ground.

### E. Claim 6: All of the errors in the aggregate violate *Strickland*

Graham argues that *Strickland* requires courts to consider the prejudice arising from all of the individual errors of defense counsel in the aggregate in assessing prejudice. This argument fails because the Eighth Circuit does not aggregate ineffective assistance of counsel claims as a ground for habeas relief. *See, e.g., Middleton v. Roper*, 455 F.3d 838, 846–51 (8th Cir. 2006) (finding no deficient performance on any of the petitioner's four claims of ineffective assistance of counsel, then rejecting his argument that the district court erred by analyzing individually instead of cumulatively the prejudice resulting from his multiple claims); *Wainwright v. Lockhart*, 80 F.3d 1226, 1233 (8th Cir. 1996) ("Neither cumulative effect of trial errors nor cumulative effect of attorney errors are grounds for habeas relief.")

Graham also makes a general argument that all of the errors described in his motion, cumulatively, require relief. He states this is especially important here because "any one of the five issues raised should either have resulted in a dismissal, or a new trial." (Doc. 5 at p. 30.) The Eighth Circuit, however, does not recognize cumulative error claims on federal habeas:

> Henderson's final contention is that all of his other allegations of error [involving a due process claim of improperly admitted evidence, ineffective assistance of counsel, and violation of the Constitution by admitting the petitioner's police statement into evidence] combine to constitute cumulative error warranting section 2254 relief. As Henderson himself acknowledges, "cumulative error does not call for habeas relief, as each habeas claim must stand or fall on its own." *Scott v. Jones*, 915 F.2d 1188, 1191 (8th Cir.1990). The district court correctly withheld habeas relief on this issue.

31

*Henderson v. Norris*, 118 F.3d 1283, 1288 (8th Cir. 1997). This Court has concluded that none of Graham's claims, standing alone, entitle him to federal habeas relief. The cumulative effect of his claims do not equal an error, and Graham is not entitled to relief on this ground.

## CONCLUSION

Graham has failed to satisfy his burden of rebutting the presumption of correctness of the state court's adjudications by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1). The state court determinations were not contrary to, nor did they involve an unreasonable application of clearly established federal law, and were reasonable determinations of the facts in light of the evidence presented. *See* 28 U.S.C. § 2254(d).

A certificate of appealability is issued for Graham's first claim: that the state court lacked jurisdiction because the felony murder charge does not satisfy the "dual criminality" requirement of the United States-Canada Extradition Treaty, which generally requires that Graham's alleged criminal activity be a crime in both nations. A certificate of appealability will not be issued for Graham's other claims because he failed to make a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Although 28 U.S.C. § 2253(c)(2) has been found to be only a "modest standard," with regard to those claims Graham has not shown that "'the issues are debatable among jurists of reason; that a court could resolve the issues [in a different manner]; or that the questions are adequate to deserve encouragement to proceed further.'" *Randolph v. Kemna*, 276 F.3d 401, 403 n.1 (8th Cir. 2002) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 n.1 (1983)). Accordingly,

IT IS ORDERED that John Graham's Petition for a Writ of Habeas Corpus, doc. 1, is DENIED, and a certificate of appealability will be issued only as to claim one: that the state court lacked jurisdiction because the felony murder charge does not satisfy the "dual criminality" requirement of the United States-Canada Extradition Treaty.

Dated this _____ day of October, 2016.

BY THE COURT:

_____
Lawrence L. Piersol
District Court Judge

ATTEST:
JOSEPH HAAS, CLERK

BY: _____
(SEAL)        DEPUTY

33